(Slip Opinion)       OCTOBER  TERM,  2012                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* KEBODEAUX

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FIFTH CIRCUIT

No. 12–418.   Argued April 17, 2013—Decided June 24, 2013

Respondent Kebodeaux was convicted by a special court-martial of a
federal sex offense.  After serving his sentence and receiving a bad
conduct discharge from the Air Force, he moved to Texas where he
registered with state authorities as a sex offender.  Congress subse-
quently enacted the Sex Offender Registration and Notification Act
(SORNA), which requires federal sex offenders to register in the
States where they live, study, and work, 42 U. S. C. §16913(a), and
which applies to offenders who, when SORNA became law, had al-
ready completed their sentences, 28 CFR §72.3.  When Kebodeaux
moved within Texas and failed to update his registration, the Federal
Government prosecuted him under SORNA, and the District Court
convicted him.  The Fifth Circuit reversed, noting that, at the time of
SORNA's enactment, Kebodeaux had served his sentence and was no
longer in any special relationship with the Federal Government.  Be-
lieving that Kebodeaux was not required to register under the pre-
SORNA Jacob Wetterling Crimes Against Children and Sexually Vio-
lent Offender Registration Act, the court found that he had been "un-
conditionally" freed.  That being so, the court held, the Federal Gov-
ernment lacked the power under Article I's Necessary and Proper
Clause to regulate his intrastate movements.

*Held*: SORNA's registration requirements as applied to Kebodeaux fall
within the scope of Congress' authority under the Necessary and
Proper Clause.  Pp. 3–12.

   (a) Contrary to the Fifth Circuit's critical assumption that Ke-
bodeaux's release was unconditional, a full reading of the relevant
statutes and regulations makes clear that at the time of his offense
and conviction he was subject to the Wetterling Act, which imposed
upon him registration requirements very similar to SORNA's.  See,

*e.g.,* 42 U. S. C. §§14072(i)(3)–(4). The fact that these federal-law requirements in part involved compliance with state-law requirements made them no less requirements of federal law. See generally *United States* v. *Sharpnack*, 355 U. S. 286, 293–294. Pp. 3–6.

(b) Congress promulgated the Wetterling Act under authority granted by the Military Regulation Clause, Art. I, §8, cl. 14, and the Necessary and Proper Clause. The same power that authorized Congress to promulgate the Uniform Code of Military Justice and punish Kebodeaux's crime also authorized Congress to make the civil registration requirement at issue here a consequence of his conviction. And its decision to impose a civil registration requirement that would apply upon the release of an offender like Kebodeaux is eminently reasonable. See *Smith* v. *Doe*, 538 U. S. 84, 102–103. It was also entirely reasonable for Congress to have assigned a special role to the Federal Government in ensuring compliance with federal sex offender registration requirements. See *Carr* v. *United States*, 560 U. S. 438, ___. Thus, Congress did not apply SORNA to an individual who had, prior to its enactment, been "unconditionally released," but rather to an individual already subject to federal registration requirements enacted pursuant to the Military Regulation and Necessary and Proper Clauses. SORNA somewhat modified the applicable registration requirements to which Kebodeaux was already subject, in order to make more uniform what had remained "a patchwork of federal and 50 individual state registration requirements," *Reynolds* v. *United States*, 565 U. S. ___, ___. No one here claims that these changes are unreasonable or that Congress could not reasonably have found them "necessary and proper" means for furthering its preexisting registration ends. Pp. 6–12.

687 F. 3d 232, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., and ALITO, J., filed opinions concurring in the judgment. SCALIA, J., filed a dissenting opinion. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined as to Parts I, II, and III–B.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–418

UNITED STATES, PETITIONER *v.* ANTHONY JAMES KEBODEAUX

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE BREYER delivered the opinion of the Court.

In 1999 a special court-martial convicted Anthony Kebodeaux, a member of the United States Air Force, of a sex offense.  It imposed a sentence of three months' imprisonment and a bad conduct discharge.  In 2006, several years after Kebodeaux had served his sentence and been discharged, Congress enacted the Sex Offender Registration and Notification Act (SORNA), 120 Stat. 590, 42 U. S. C. §16901 *et seq.*, a federal statute that requires those convicted of federal sex offenses to register in the States where they live, study, and work.  §16913(a); 18 U. S. C. §2250(a).  And, by regulation, the Federal Government made clear that SORNA's registration requirements apply to federal sex offenders who, when SORNA became law, had already completed their sentences.  42 U. S. C. §16913(d) (Attorney General's authority to issue regulations); 28 CFR §72.3 (2012) (regulation specifying application to pre-SORNA offenders).

We here must decide whether the Constitution's Necessary and Proper Clause grants Congress the power to enact SORNA's registration requirements and apply them

to a federal offender who had completed his sentence prior to the time of SORNA's enactment. For purposes of answering this question, we assume that Congress has complied with the Constitution's *Ex Post Facto* and Due Process Clauses. See *Smith* v. *Doe*, 538 U. S. 84, 105–106 (2003) (upholding a similar Alaska statute against *ex post facto* challenge); Supp. Brief for Kebodeaux on Rehearing En Banc in No. 08–51185 (CA5) (not raising any Due Process challenge); Brief for Respondent (same). We conclude that the Necessary and Proper Clause grants Congress adequate power to enact SORNA and to apply it here.

I

As we have just said, in 1999 a special court-martial convicted Kebodeaux, then a member of the Air Force, of a federal sex offense. He served his 3-month sentence; the Air Force released him with a bad conduct discharge. And then he moved to Texas. In 2004 Kebodeaux registered as a sex offender with Texas state authorities. Brief for Respondent 6–7. In 2006 Congress enacted SORNA. In 2007 Kebodeaux moved within Texas from San Antonio to El Paso, updating his sex offender registration. App. to Pet. for Cert. 167a–168a. But later that year he returned to San Antonio without making the legally required sex-offender registration changes. *Id.,* at 169a. And the Federal Government, acting under SORNA, prosecuted Kebodeaux for this last-mentioned SORNA registration failure.

A Federal District Court convicted Kebodeaux of having violated SORNA. See 687 F. 3d 232, 234 (CA5 2012) (en banc). On appeal a panel of the United States Court of Appeals for the Fifth Circuit initially upheld the conviction. 647 F. 3d 137 (2011) (*per curiam*). But the Circuit then heard the appeal en banc and, by a vote of 10 to 6, reversed. 687 F. 3d, at 234. The court stated that, by the

time Congress enacted SORNA, Kebodeaux had "fully served" his sex-offense sentence; he was "no longer in federal custody, in the military, under any sort of supervised release or parole, or in any other special relationship with the federal government." *Ibid.*

The court recognized that, even before SORNA, federal law required certain federal sex offenders to register. *Id.,* at 235, n. 4. See Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, §170101, 108 Stat. 2038–2042. But it believed that the pre-SORNA federal registration requirements did not apply to Kebodeaux. 687 F. 3d, at 235, n. 4. Hence, in the Circuit's view, Kebodeaux had been "*unconditionally* let . . . free." *Id.,* at 234. And, that being so, the Federal Government lacked the power under Article I's Necessary and Proper Clause to regulate through registration Kebodeaux's intrastate movements. *Id.,* at 234–235. In particular, the court said that after "the federal government has *unconditionally* let a person free . . . the fact that he once committed a crime is not a jurisdictional basis for subsequent regulation and possible criminal prosecution." *Ibid.*

The Solicitor General sought certiorari. And, in light of the fact that a Federal Court of Appeals has held a federal statute unconstitutional, we granted the petition. See, *e.g., United States* v. *Morrison,* 529 U. S. 598, 605 (2000); *United States* v. *Edge Broadcasting Co.,* 509 U. S. 418, 425 (1993).

## II

We do not agree with the Circuit's conclusion. And, in explaining our reasons, we need not go much further than the Circuit's critical assumption that Kebodeaux's release was "unconditional," *i.e.,* that after Kebodeaux's release, he was not in "any . . . special relationship with the federal government." 687 F. 3d, at 234. To the contrary, the

Solicitor General, tracing through a complex set of statutory cross-references, has pointed out that at the time of his offense and conviction Kebodeaux was subject to the federal Wetterling Act, an Act that imposed upon him registration requirements very similar to those that SORNA later mandated. Brief for United States 18–29.

Congress enacted the Wetterling Act in 1994 and updated it several times prior to Kebodeaux's offense. Like SORNA, it used the federal spending power to encourage States to adopt sex offender registration laws. 42 U. S. C. §14071(i) (2000 ed.); *Smith, supra*, at 89–90. Like SORNA, it applied to those who committed federal sex crimes. §14071(b)(7)(A). And like SORNA, it imposed federal penalties upon federal sex offenders who failed to register in the States in which they lived, worked, and studied. §§14072(i)(3)–(4).

In particular, §14072(i)(3) imposed federal criminal penalties upon any "person who is . . . described in section 4042(c)(4) of title 18, and knowingly fails to register in any State in which the person resides." The cross-referenced §4042(c)(4) said that a "person is described in this paragraph if the person was convicted of" certain enumerated offenses or "[a]ny other offense designated by the Attorney General as a sexual offense for purposes of this subsection." 18 U. S. C. §4042(c)(4). In 1998 the Attorney General "delegated this authority [to designate sex offenses] to the Director of the Bureau of Prisons." Dept. of Justice, Bureau of Prisons, Designation of Offenses Subject to Sex Offender Release Notification, 63 Fed. Reg. 69386. And that same year the Director of the Bureau of Prisons "designate[d]" the offense of which Kebodeaux was convicted, namely the military offense of "carnal knowledge" as set forth in Article 120(B) of the Code of Military Justice. *Id.,* at 69387  See 28 CFR §571.72(b)(2) (1999). A full reading of these documents makes clear that, contrary to Kebodeaux's contention, the relevant penalty applied to

crimes committed by military personnel.

Moreover, a different Wetterling Act section imposed federal criminal penalties upon any "person who is . . . sentenced by a court martial for conduct in a category specified by the Secretary of Defense under section 115(a)(8)(C) of title I of Public Law 105–119, and knowingly fails to register in any State in which the person resides." 42 U. S. C. §14072(i)(4) (2000 ed.). The cross-referenced section, §115(a)(8)(C), said that the "Secretary of Defense shall specify categories of conduct punishable under the Uniform Code of Military Justice which encompass a range of conduct comparable to that described in [certain provisions of the Violent Crime Control and Law Enforcement Act of 1994], and such other conduct as the Secretary deems appropriate." 1998 Appropriations Act, §115(a)(8)(C)(i), 111 Stat. 2466. See note following 10 U. S. C. §951 (2000 ed.). The Secretary had delegated certain types of authority, such as this last mentioned "deem[ing]" authority, to an Assistant Secretary of Defense. DoD Directive 5124.5, p. 4 (Oct. 31, 1994). And in December 1998 an Assistant Secretary, acting pursuant to this authority, published a list of military crimes that included the crime of which Kebodeaux was convicted, namely Article 120(B) of the Uniform Code of Military Justice. App. to Pet. for Cert. 171a–175a. The provision added that "[c]onvictions . . . shall trigger requirements to notify state and local law enforcement agencies and to provide information to inmates concerning sex offender registration requirements." *Id.,* at 175a. And, the provision says (contrary to Kebodeaux's reading, Brief for Respondent 57), that it shall "take effect immediately." It contains no expiration date. App. to Pet. for Cert. 175a.

We are not aware of any plausible counterargument to the obvious conclusion, namely that as of the time of Kebodeaux's offense, conviction and release from federal custody, these Wetterling Act provisions applied to Kebo-

deaux and imposed upon him registration requirements very similar to those that SORNA later imposed. Contrary to what the Court of Appeals may have believed, the fact that the federal law's requirements in part involved compliance with state-law requirements made them no less requirements of federal law. See generally *United States* v. *Sharpnack*, 355 U. S. 286, 293–294 (1958) (Congress has the power to adopt as federal law the laws of a State and to apply them in federal enclaves); *Gibbons* v. *Ogden*, 9 Wheat. 1, 207–208 (1824) ("Although Congress cannot enable a State to legislate, Congress may adopt the provisions of a State on any subject. . . . The act [adopts state systems for regulation of pilots] and gives [them] the same validity as if its provisions had been specially made by Congress").

## III

Both the Court of Appeals and Kebodeaux come close to conceding that if, as of the time of Kebodeaux's offense, he was subject to a federal registration requirement, then the Necessary and Proper Clause authorized Congress to modify the requirement as in SORNA and to apply the modified requirement to Kebodeaux. See 687 F. 3d, at 234–235, and n. 4; Tr. of Oral Arg. 38–39. And we believe they would be right to make this concession.

No one here claims that the Wetterling Act, as applied to military sex offenders like Kebodeaux, falls outside the scope of the Necessary and Proper Clause. And it is difficult to see how anyone could persuasively do so. The Constitution explicitly grants Congress the power to "make Rules for the . . . Regulation of the land and naval Forces." Art. I, §8, cl. 14. And, in the Necessary and Proper Clause itself, it grants Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers" and "all other Powers" that the Constitution vests "in the Govern-

ment of the United States, or in any Department or Officer thereof." *Id.*, cl. 18.

The scope of the Necessary and Proper Clause is broad. In words that have come to define that scope Chief Justice Marshall long ago wrote:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819).

As we have come to understand these words and the provision they explain, they "leav[e] to Congress a large discretion as to the means that may be employed in executing a given power." *Lottery Case*, 188 U. S. 321, 355 (1903). See *Morrison*, 529 U. S., at 607. The Clause allows Congress to "adopt any means, appearing to it most eligible and appropriate, which are adapted to the end to be accomplished and consistent with the letter and spirit of the Constitution." *James Everard's Breweries* v. *Day*, 265 U. S. 545, 559 (1924).

The Constitution, for example, makes few explicit references to federal criminal law, but the Necessary and Proper Clause nonetheless authorizes Congress, in the implementation of other explicit powers, to create federal crimes, to confine offenders to prison, to hire guards and other prison personnel, to provide prisoners with medical care and educational training, to ensure the safety of those who may come into contact with prisoners, to ensure the public's safety through systems of parole and supervised release, and, where a federal prisoner's mental condition so requires, to confine that prisoner civilly after the expiration of his or her term of imprisonment. See *United States* v. *Comstock*, 560 U. S. 126, 136–137 (2010).

Here, under the authority granted to it by the Military

Regulation and Necessary and Proper Clauses, Congress could promulgate the Uniform Code of Military Justice. It could specify that the sex offense of which Kebodeaux was convicted was a military crime under that Code. It could punish that crime through imprisonment and by placing conditions upon Kebodeaux's release. And it could make the civil registration requirement at issue here a consequence of Kebodeaux's offense and conviction. This civil requirement, while not a specific condition of Kebodeaux's release, was in place at the time Kebodeaux committed his offense, and was a consequence of his violation of federal law.

And Congress' decision to impose such a civil requirement that would apply upon the release of an offender like Kebodeaux is eminently reasonable. Congress could reasonably conclude that registration requirements applied to federal sex offenders after their release can help protect the public from those federal sex offenders and alleviate public safety concerns. See *Smith*, 538 U. S., at 102–103 (sex offender registration has "a legitimate nonpunitive purpose of 'public safety, which is advanced by alerting the public to the risk of sex offenders in their community'"). There is evidence that recidivism rates among sex offenders are higher than the average for other types of criminals. See Dept. of Justice, Bureau of Justice Statistics, P. Langan, E. Schmitt, & M. Durose, Recidivism of Sex Offenders Released in 1994, p. 1 (Nov. 2003) (reporting that compared to non-sex offenders, released sex offenders were four times more likely to be rearrested for a sex crime, and that within the first three years following release 5.3% of released sex offenders were rearrested for a sex crime). There is also conflicting evidence on the point. Cf. R. Tewsbury, W. Jennings, & K. Zgoba, Final Report on Sex Offenders: Recidivism and Collateral Consequences (Sept. 2011) (concluding that sex offenders have relatively low rates of recidivism, and that registration

Opinion of the Court

requirements have limited observable benefits regarding recidivism). But the Clause gives Congress the power to weigh the evidence and to reach a rational conclusion, for example, that safety needs justify postrelease registration rules. See *Lambert* v. *Yellowley*, 272 U. S. 581, 594–595 (1926) (upholding congressional statute limiting the amount of spirituous liquor that may be prescribed by a physician, and noting that Congress' "finding [regarding the appropriate amount], in the presence of the well-known diverging opinions of physicians, cannot be regarded as arbitrary or without a reasonable basis"). See also *Gonzales* v. *Raich*, 545 U. S. 1, 22 (2005) ("In assessing the scope of Congress' authority under the Commerce Clause, we stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding"). See also H. R. Rep. No. 109–218, pt. 1, pp. 22, 23 (2005) (House Report) (citing statistics compiled by the Justice Department as support for SORNA's sex offender registration regime).

At the same time, "it is entirely reasonable for Congress to have assigned the Federal Government a special role in ensuring compliance with SORNA's registration requirements by federal sex offenders—persons who typically would have spent time under federal criminal supervision." *Carr* v. *United States*, 560 U. S. 438, ___ (2010) (slip op., at 12). The Federal Government has long kept track of former federal prisoners through probation, parole, and supervised release in part to prevent further crimes thereby protecting the public against the risk of recidivism. See Parole Act, 36 Stat. 819; Probation Act, ch. 521, 43 Stat. 1259; Sentencing Reform Act of 1984, ch. II, 98 Stat. 1987. See also 1 N. Cohen, The Law of Probation and Parole §§7:3, 7:4 (2d ed. 1999) (principal purposes of postrelease conditions are to rehabilitate the convict, thus preventing

him from recidivating, and to protect the public). Neither, as of 1994, was registration particularly novel, for by then States had implemented similar requirements for close to half a century. See W. Logan, Knowledge as Power: Criminal Registration and Community Notification Laws in America 30–31 (2009). Moreover, the Wetterling Act took state interests into account by, for the most part, requiring released federal offenders to register in accordance with state law. At the same time, the Wetterling Act's requirements were reasonably narrow and precise, tying time limits to the type of sex offense, incorporating state-law details, and relating penalties for violations to the sex crime initially at issue. See 42 U. S. C. §14071(b) (2000 ed.).

The upshot is that here Congress did not apply SORNA to an individual who had, prior to SORNA's enactment, been "unconditionally released," *i.e.*, a person who was not in "any . . . special relationship with the federal government," but rather to an individual already subject to federal registration requirements that were themselves a valid exercise of federal power under the Military Regulation and Necessary and Proper Clauses. But cf. *post*, at 1 (SCALIA, J., dissenting).

SORNA, enacted after Kebodeaux's release, somewhat modified the applicable registration requirements. In general, SORNA provided more detailed definitions of sex offenses, described in greater detail the nature of the information registrants must provide, and imposed somewhat different limits upon the length of time that registration must continue and the frequency with which offenders must update their registration. 42 U. S. C. §§16911, 16913–16916 (2006 ed. and Supp. V). But the statute, like the Wetterling Act, used Spending Clause grants to encourage States to adopt its uniform definitions and requirements. It did not insist that the States do so. See §§16925(a), (d) (2006 ed.) ("The provisions of this subchap-

ter that are cast as directions to jurisdictions or their officials constitute, in relation to States, only conditions required to avoid the reduction of Federal funding under this section").

As applied to an individual already subject to the Wetterling Act like Kebodeaux, SORNA makes few changes. In particular, SORNA modified the time limitations for a sex offender who moves to update his registration to within three business days of the move from both seven days before and seven days after the move, as required by the Texas law enforced under the Wetterling Act. Compare 42 U. S. C. §16913(c) with App. to Pet. for Cert. 167a–168a. SORNA also increased the federal penalty for a federal offender's registration violation to a maximum of 10 years from a maximum of 1 year for a first offense. Compare 18 U. S. C. §2250(a) with 42 U. S. C. §14072(i) (2000 ed.). Kebodeaux was sentenced to one year and one day of imprisonment. For purposes of federal law, SORNA *reduced* the duration of Kebodeaux's registration requirement to 25 years from the lifetime requirement imposed by Texas law, compare 42 U. S. C. §16915(a) (2006 ed.) with App. to Pet. for Cert. 167a, and *reduced* the frequency with which Kebodeaux must update his registration to every six months from every 90 days as imposed by Texas law, compare 42 U. S. C. §16916(2) with App. to Pet. for Cert. 167a. And as far as we can tell, while SORNA punishes violations of its requirements (instead of violations of state law), the Federal Government has prosecuted a sex offender for violating SORNA only when that offender also violated state-registration requirements.

SORNA's general changes were designed to make more uniform what had remained "a patchwork of federal and 50 individual state registration systems," *Reynolds* v. *United States*, 565 U. S. ___, ___ (2012) (slip op., at 2), with "loopholes and deficiencies" that had resulted in an estimated 100,000 sex offenders becoming "missing" or

"lost," House Report 20, 26. See S. Rep. No. 109–369, pp. 16–17 (2006). See also *Jinks* v. *Richland County*, 538 U. S. 456, 462–463 (2003) (holding that a statute is authorized by the Necessary and Proper Clause when it "provides an alternative to [otherwise] unsatisfactory options" that are "obviously inefficient"). SORNA's more specific changes reflect Congress' determination that the statute, changed in respect to frequency, penalties, and other details, will keep track of more offenders and will encourage States themselves to adopt its uniform standards. No one here claims that these changes are unreasonable or that Congress could not reasonably have found them "necessary and proper" means for furthering its preexisting registration ends.

We conclude that the SORNA changes as applied to Kebodeaux fall within the scope Congress' authority under the Military Regulation and Necessary and Proper Clauses. The Fifth Circuit's judgment to the contrary is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–418

———————

## UNITED STATES, PETITIONER *v.* ANTHONY JAMES KEBODEAUX

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

CHIEF JUSTICE ROBERTS, concurring in the judgment.

I agree with the Court that Congress had the power, under the Military Regulation and Necessary and Proper Clauses of Article I, to require Anthony Kebodeaux to register as a sex offender. The majority, having established that premise and thus resolved the case before us, nevertheless goes on to discuss the general public safety benefits of the registration requirement. *Ante,* at 8–10. Because that analysis is beside the point in this case, I concur in the judgment only.

While serving in the Air Force, Kebodeaux violated the Uniform Code of Military Justice by having sexual relations with a minor. A special court-martial convicted him. As relevant here, that conviction had two consequences: First, Kebodeaux was sentenced to confinement for three months. And second, as the majority describes, he was required to register as a sex offender with the State in which he resided and keep that registration current; failure to do so would subject him to federal criminal penalties. *Ante,* at 4–6.

In the same way that Congress undoubtedly had the authority to impose the first consequence for a violation of military rules, it also had the authority to impose the second. The Constitution gives Congress the power "[t]o make Rules for the Government and Regulation of the

land and naval Forces." Art. I, §8, cl. 14. And, under the Necessary and Proper Clause, Congress can give those rules force by imposing consequences on members of the military who disobey them. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 416 (1819) ("All admit that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of Congress."). A servicemember will be less likely to violate a relevant military regulation if he knows that, having done so, he will be required to register as a sex offender years into the future.

It is this power, the power to regulate the conduct of members of the military by imposing consequences for their violations of military law, that supports application of the federal registration obligation to Kebodeaux. As the Court explains, the Wetterling Act was in force when Kebodeaux committed the original offense, and applied to him as soon as the special court-martial rendered its verdict. See *ante,* at 5–6. Congress later, in enacting the Sex Offender Registration and Notification Act (SORNA), modified the registration regime in place under the Wetterling Act. But as applied to Kebodeaux here (the relevant inquiry in this as-applied challenge), those changes were insignificant; their only effect was that Kebodeaux received a day more than he could have received for the same conduct had the Wetterling Act remained in force. See *ante*, at 11 (describing SORNA's effect on Kebodeaux's registration obligations); compare *post*, at 10, n. 3 (THOMAS, J., dissenting) (discussing changes that did not affect Kebodeaux). Whatever other constitutional concerns might attach to such a change, as a question of Article I *power* it was permissible. Just as the Federal Government may, under the Necessary and Proper Clause, alter the conditions of a federal prisoner's confinement or adjust the timing and location of drug tests required of a federal convict, so too could it make

slight modifications to a previously imposed registration obligation.

The majority says, more or less, the same thing. *Ante*, at 8, 11–12. But sandwiched between its discussion of the basis for Congress's power and its discussion of the inconsequential nature of the changes is a discussion of benefits from the registration system. Along with giving force to military regulations, the majority notes, Congress could also have "reasonably conclude[d] that registration requirements . . . help protect the public from . . . federal sex offenders and alleviate public safety concerns." *Ante,* at 8.

Maybe so, but those consequences of the registration requirement are irrelevant for our purposes. Public safety benefits are neither necessary nor sufficient to a proper exercise of the power to regulate the military. What matters—all that matters—is that Congress could have rationally determined that "mak[ing] the civil registration requirement at issue here a consequence of Kebodeaux's offense" would give force to the Uniform Code of Military Justice adopted pursuant to Congress's power to regulate the Armed Forces. *Ibid.*

Ordinarily such surplusage might not warrant a separate writing. Here, however, I worry that incautious readers will think they have found in the majority opinion something they would not find in either the Constitution or any prior decision of ours: a federal police power. The danger of such confusion is heightened by the fact the Solicitor General adopted something very close to the police power argument, contending that "the federal government has greater ties to former federal sex offenders than it does to other members of the general public," and can therefore impose restrictions on them even years after their unconditional release simply to "serve[ ] . . . public-protection purposes." Brief for United States 34–35.

I write separately to stress not only that a federal police power is immaterial to the result in this case, but also that

such a power *could not* be material to the result in this
case—because it does not exist. See *United States* v.
*Morrison*, 529 U. S. 598, 618–619 (2000) ("'[W]e *always*
have rejected readings of . . . the scope of federal power
that would permit Congress to exercise a police power'"
(quoting *United States* v. *Lopez*, 514 U. S. 549, 584–585
(1995) (THOMAS, J., concurring))).

Our resistance to congressional assertions of such a
power has deep roots. From the first, we have recognized
that "the powers of the government are limited, and that
its limits are not to be transcended." *McCulloch,* 4
Wheat., at 420–421. Thus, while the Necessary and
Proper Clause authorizes congressional action "incidental
to [an enumerated] power, and conducive to its beneficial
exercise," Chief Justice Marshall was emphatic that no
"great substantive and independent power" can be "im-
plied as incidental to other powers, or used as a means of
executing them." *Id.,* at 418, 411; see also *Gibbons* v.
*Ogden*, 9 Wheat. 1, 195 (1824) ("The enumeration presup-
poses something not enumerated").

It is difficult to imagine a clearer example of such a
"great substantive and independent power" than the
power to "help protect the public . . . and alleviate pub-
lic safety concerns," *ante,* at 8. I find it implausible to
suppose—and impossible to support—that the Framers in-
tended to confer such authority by implication rather than
expression. A power of that magnitude vested in the
Federal Government is not "consist[ent] with the letter
and spirit of the constitution," *McCulloch*, *supra,* at 421,
and thus not a "proper [means] for carrying into Execu-
tion" the enumerated powers of the Federal Government,
U. S. Const., Art. I, §8, cl. 18. See *United States* v. *Com-
stock*, 560 U. S. 126, 153 (2010) (KENNEDY, J., concurring
in judgment) ("It is of fundamental importance to consider
whether essential attributes of state sovereignty are com-
promised by the assertion of federal power under the

Necessary and Proper Clause").

It makes no difference that the Federal Government would be policing people previously convicted of a federal crime—even a federal sex crime. The fact of a prior federal conviction, by itself, does not give Congress a freestanding, independent, and perpetual interest in protecting the public from the convict's purely intrastate conduct.

But as I have said, I do not understand the majority's opinion to be based on such a power. The connection to the Military Regulation Clause on which the majority relies, *ante*, at 8, is less attenuated, and the power it produces less substantial, than would be true of a federal police power over prior federal offenders; the power to threaten and impose particular obligations as a result of a violation of military law is not such a "great substantive and independent power" that the Framers' failure to enumerate it must imply its absence.

Nevertheless, I fear that the majority's discussion of the public-safety benefits of the registration requirement will be mistaken for an endorsement of the Solicitor General's public-safety *basis* for the law. I accordingly concur in the judgment only.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–418

_____

## UNITED STATES, PETITIONER *v.* ANTHONY JAMES KEBODEAUX

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE ALITO, concurring in the judgment.

I concur in the judgment solely on the ground that the registration requirement at issue is necessary and proper to execute Congress' power "[t]o make Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, §8, cl. 14. Exercising this power, Congress has enacted provisions of the Uniform Code of Military Justice (UCMJ) that authorize members of the military to be tried before a military tribunal, rather than a state court, for ordinary criminal offenses, including sex crimes, that are committed both within and outside the boundaries of a military installation. See, *e.g.*, UCMJ Art. 2 (persons subject to UCMJ); Art. 5 ("This chapter applies in all places"); Art. 120 (rape by a person subject to UCMJ); *Solorio* v. *United States*, 483 U. S. 435, 436–438 (1987) (servicemember may be court-martialed for off-base crime without "service connection"). States usually have concurrent jurisdiction over such crimes when they are committed off base and sometimes possess jurisdiction over such offenses when committed on base.[1]  These of-

_____

[1] See 1 F. Gilligan & F. Lederer, Court-Martial Procedure §2–40.00, p. 2–47 (3d ed. 2006) (hereinafter Gilligan & Lederer). This depends on the circumstances under which the Federal Government acquires the land in question. See Morrison, State Property Tax Implications for Military Privatized Family Housing Program, 56 Air Force L. Rev. 261,

fenses, however, are rarely prosecuted in both a military and a state court, and therefore when a servicemember is court-martialed for a sex offense over which the State had jurisdiction, this is usually because the State has deferred to the military.[2]  Where the offense in question is a sex crime, a consequence of this handling of the case is that the offender, if convicted, may fall through the cracks of a state registration system.  For example, if the service-member is convicted of a sex offense in a state court, the state court may be required by state law to provide that information to the state registry.  See, *e.g.*, Colo. Rev. Stat. Ann. §16–22–104(1)(a)(I) (2012).  State law may also require the state corrections department to notify both state and local police of the offender's release.  See, *e.g.,*

––––––––––

269–270 (2005).  See generally Manual for Courts-Martial, United States, Rule for Court-Martial 201(d)(3) (2012) (Rule) (discussing situations "[w]here an act or omission is subject to trial by court-martial and by one or more civil tribunals"); D. Schlueter, Military Criminal Justice:  Practice & Procedure §4–12(A), p. 231 (8th ed. 2012) (hereinafter Schlueter).

[2] "Where an act or omission is subject to trial by court-martial and by one or more civil tribunals," "the determination which nation, state, or agency will exercise jurisdiction is a matter for the nations, states, and agencies concerned, and is not a right of the suspect or accused." Rule 201(d)(3).  And as the commentary to Rule 201(d) explains, "the determination which agency shall exercise jurisdiction should normally be made through consultation or prior agreement between appropriate military officials . . . and appropriate civilian authorities."  See Discussion following Rule 201(d), p. 2–10; see also Secretary of Air Force, Air Force Instruction 51–201, §§2.6.1–2.6.3 (June 6, 2013); Schlueter §4-12(B), at 231–232.  "[I]t is constitutionally permissible to try a person by court-martial and by a State court for the same act," Discussion following Rule 201(d), at 2–10; see Schlueter §4–12(B), at 232, §13–3(F), at 691; however, "as a matter of policy a person who is pending trial or has been tried by a State court should not ordinarily be tried by court-martial for the same act," Discussion following Rule 201(d), at 2–10; Air Force Instruction 51–201, §§2.6.1, 2.6.2; Gilligan & Lederer §7–50.00, at 7–17.

§16–22–107(3). Provisions such as these are designed to prevent sex offenders from avoiding registration, as many have in the past. See H. R. Rep. No. 109–218, pt. 1, p. 26 (2005) (despite pre-SORNA registration efforts, "[t]he most significant enforcement issue in the sex offender program [was] that over 100,000 sex offenders, or nearly one-fifth in the Nation are 'missing,' meaning that they have not complied with sex offender registration requirements"). When a servicemember is convicted by a military tribunal, however, the State has no authority to require that tribunal to notify the state registry, nor does it have the authority to require the officials at a military prison to notify state or local police when the servicemember is released from custody. Because the exercise of military jurisdiction may have this effect—in other words, may create a gap in the laws intended to maximize the registration of sex offenders—it is necessary and proper for Congress to require the registration of members of the military who are convicted of a qualifying sex offense in a military court. When Congress, in validly exercising a power expressly conferred by the Constitution, creates or exacerbates a dangerous situation (here, the possibility that a convicted sex offender may escape registration), Congress has the power to try to eliminate or at least diminish that danger. See *United States* v. *Comstock*, 560 U. S. 126, 155–158 (2010) (ALITO, J., concurring in judgment). I accordingly concur in the judgment only.

# SUPREME COURT OF THE UNITED STATES

No. 12–418

## UNITED STATES, PETITIONER *v.* ANTHONY JAMES KEBODEAUX

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE SCALIA, dissenting.

I join Parts I, II, and III–B of JUSTICE THOMAS's dissent. I do not join Part III–A because I do not agree that what is necessary and proper to enforce a statute validly enacted pursuant to an enumerated power is not itself necessary and proper to the execution of an enumerated power. It is my view that if "Congress has the authority" to act, then it also "'possesses every power needed'" to make that action "'effective.'" *Gonzales* v. *Raich*, 545 U. S. 1, 36 (2005) (SCALIA, J., concurring in judgment) (quoting *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 118–119 (1942)). If I thought that SORNA's registration requirement were "'reasonably adapted,'" *Raich, supra*, at 37, to carrying into execution some other, valid enactment, I would sustain it.

But it is not. The lynchpin of the Court's reasoning is that Kebodeaux was "subject to a federal registration requirement"—the Wetterling Act—at the time of his offense, and so the Necessary and Proper Clause "authorized Congress to modify the requirement as in SORNA and to apply the modified requirement to Kebodeaux." *Ante,* at 6. That does not establish, however, that the Wetterling Act's registration requirement was itself a valid exercise of any federal power, or that SORNA is designed to carry the Wetterling Act into execution. The former proposition is dubious, the latter obviously untrue.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–418

_____

## UNITED STATES, PETITIONER *v.* ANTHONY JAMES KEBODEAUX

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins as to
Parts I, II, and III–B, dissenting.

Anthony Kebodeaux was convicted under the Sex Of-
fender Registration and Notification Act (SORNA), 42
U. S. C. §16901 *et seq.*, for failing to update his sex of-
fender registration when he moved from one Texas city to
another. The Court today holds that Congress has power
under the Necessary and Proper Clause to enact SORNA
and criminalize Kebodeaux's failure to update his registra-
tion. I disagree. As applied to Kebodeaux, SORNA does
not "carr[y] into Execution" any of the federal powers enu-
merated in the Constitution. Art. I, §8, cl. 18. Rather,
it usurps the general police power vested in the States.
Because SORNA's registration requirements are unconsti-
tutional as applied to Kebodeaux, I respectfully dissent.

I

Congress enacted SORNA in 2006. SORNA requires
that every "sex offender shall register, and keep the regis-
tration current, in each jurisdiction where the offender
resides, where the offender is an employee, and where the
offender is a student." 42 U. S. C. §16913(a).[1] These re-

_____

[1] A "sex offender" is defined as "an individual who was convicted" of
an offense that falls within the statute's defined offenses. 42 U. S. C.
§§16911(1) and (5)–(7).

quirements "apply to all sex offenders, including sex of-
fenders convicted of the offense for which registration is
required prior to the enactment of [SORNA]." 28 CFR
§72.3 (2012). As relevant here, SORNA makes it a federal
crime when someone who is required to register as a sex
offender "knowingly fails to register or update a regis-
tration" and that person "is a sex offender [as defined
by SORNA] by reason of a conviction under Federal
law (including the Uniform Code of Military Justice)." 18
U. S. C. §§2250(a)(2)(A), (3).

In March 1999, Anthony Kebodeaux had consensual sex
with a 15-year-old girl when he was a 20-year-old Air-
man in the U. S. Air Force. He was convicted by a court-
martial of carnal knowledge of a female under the age
of 16, in violation of Article 120(b) of the Uniform Code of
Military Justice (UCMJ). He was sentenced to three
months' imprisonment and received a bad-conduct dis-
charge. He completed his sentence in September 1999 and
was no longer in federal custody or the military when
Congress enacted SORNA, which required him to register
as a sex offender. In 2007, Kebodeaux failed to update his
sex-offender registration within three days of moving from
El Paso, Texas, to San Antonio, Texas. He was convicted
under §2250(a)(2)(A) in 2008 and sentenced to a year and
a day in prison. The question before the Court is whether
Congress has power to require Kebodeaux to register as a
sex offender and to criminalize his failure to do so.

## II
### A

The Constitution creates a Federal Government with
limited powers. Congress has no powers except those
specified in the Constitution. See *Marbury* v. *Madison*,
1 Cranch 137, 176 (1803) (Marshall, C. J.) ("The powers of
the legislature are defined, and limited; and that those
limits may not be mistaken, or forgotten, the constitution

is written"). Thus, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States* v. *Morrison*, 529 U. S. 598, 607 (2000).

A different default rule applies to the States. As the Tenth Amendment makes clear, the States enjoy all powers that the Constitution does not withhold from them. ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people") While the powers of Congress are "few and defined," the powers that "remain in the State governments are numerous and indefinite." The Federalist No. 45, p. 328 (B. Wright ed. 1961) (J. Madison).

The Constitution sets forth Congress' limited powers in Article I. That Article begins by "vest[ing]" in Congress "[a]ll legislative Powers herein granted," and then enumerates those powers in §8. The final clause of §8, the Necessary and Proper Clause, gives Congress power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, §8, cl. 18. Importantly, the Necessary and Proper Clause is not a freestanding grant of congressional power, but rather an authorization to makes laws that are necessary to execute both the powers vested in Congress by the preceding clauses of §8, and the powers vested in Congress and the other branches by other provisions of the Constitution. See, *e.g., Kinsella* v. *United States ex rel. Singleton*, 361 U. S. 234, 247 (1960) ("The [Necessary and Proper Clause] is not itself a grant of power, but a *caveat* that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of §8 'and all other Powers vested by this Constitution'").

In *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), Chief

Justice Marshall famously set forth the Court's interpretation of the Necessary and Proper Clause:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist[ent] with the letter and spirit of the constitution, are constitutional." *Id.,* at 421.

Under this formulation, a federal law is a valid exercise of Congress' power under the Clause if it satisfies a two-part test. "First, the law must be directed toward a 'legitimate' end, which *McCulloch* defines as one 'within the scope of the [C]onstitution.'" *United States* v. *Comstock*, 560 U. S. 126, 160 (2010) (THOMAS, J., dissenting) (quoting 4 Wheat., at 421). In other words, the law must be directed at "carrying into Execution" one or more of the powers delegated to the Federal Government by the Constitution. Art. I, §8, cl. 18. "Second, there must be a necessary and proper fit between the 'means' (the federal law) and the 'end' (the enumerated power or powers) it is designed to serve." *Comstock*, 560 U. S., at 160 (THOMAS, J., dissenting). "The means Congress selects will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power, and 'proper' if they are not otherwise 'prohibited' by the Constitution and not '[in]consistent' with its 'letter and spirit.'" *Id.,* at 160–161 (quoting Art. I, §8, cl. 18 and *McCulloch*, 4 Wheat., at 421).

Both parts of this test are critical. "[N]o matter how 'necessary' or 'proper' an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers." *Comstock, supra,* at 161 (THOMAS, J., dissenting). As applied to Kebodeaux, SORNA fails this test.

## B

It is undisputed that no enumerated power in Article I, §8, gives Congress the power to punish sex offenders who fail to register, nor does any other provision in the Constitution vest Congress or the other branches of the Federal Government with such a power. Thus, SORNA is a valid exercise of congressional authority only if it is "necessary and proper for carrying into Execution" one or more of those federal powers enumerated in the Constitution.

In the course of this litigation, the Government has argued that Kebodeaux's conviction under §2250(a)(2)(A) executes Congress' enumerated powers to spend for the general welfare, Art. I, §8, cl. 1; to regulate interstate commerce, §8, cl. 3; and to regulate the armed forces, §8, cl. 14. But none of these powers justifies applying §2250(a)(2)(A) to Kebodeaux. The Spending Clause argument is a nonstarter. Section 2250(a)(2)(A) does not execute Congress' spending power because it regulates individuals who have not necessarily received federal funds of any kind. The Government contends that "federal funding and logistical support offered to States for their sex-offender-registration-and-notification programs can be effective only if persons required to register actually do so" and that "Congress may impose penalties on such individuals as a means of achieving that goal." Brief for United States 52. But we have never held that Congress gains the power to regulate private individuals merely because it provides money to the States in which they reside.

Nor does the Commerce Clause—the enumerated power that the Court has construed most broadly—support §2250(a)(2)(A). Under this Court's precedents, Congress may use its Commerce Clause power to regulate (1) "'the use of the channels of interstate commerce,'" (2) "'the instrumentalities of interstate commerce, or persons or things in interstate commerce,'" and (3) economic activities that "'substantially affect interstate commerce.'"

*United States* v. *Lopez*, 514 U. S. 549, 558–559 (1995); see also *Morrison*, 529 U. S., at 617. Section 2250(a)(2)(A) does not fall within the first two categories because it is not limited to regulating sex offenders who have traveled in interstate commerce. Instead, it applies to all federal sex offenders who fail to register, even if they never cross state lines. Nor does §2250(a)(2)(A) fall within the third category. Congress may not regulate noneconomic activity, such as sex crimes, based on the effect it might have on interstate commerce. Cf. *Morrison, supra*, at 617. ("We . . . reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce"). In short, §2250(a)(2)(A) regulates activity that is neither "'interstate'" nor "'commercial,'" 687 F. 3d 232, 253 (CA5 2012), and, thus, it   cannot be justified on the ground that it executes Congress' power to regulate interstate commerce.

Finally, Congress' power "[t]o make Rules for the Government and Regulation of the land and naval Forces" does not support Kebodeaux's conviction under §2250(a)(2)(A). Art. I, §8, cl. 14. Kebodeaux had long since fully served his criminal sentence for violating Article 120(b) of the UCMJ and was no longer in the military when Congress enacted SORNA. Congress does not retain a general police power over every person who has ever served in the military. See *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 14 (1955) ("It has never been intimated by this Court . . . that Article I military jurisdiction could be extended to civilian ex-soldiers who had severed all relationship with the military and its institutions. . . . [G]iven its natural meaning, the power granted Congress 'To make Rules' to regulate 'the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces"). Accordingly, Kebodeaux's conviction under §2250(a)(2)(A) cannot be sustained based on Congress'

power over the military.

Moreover, it is clear from the face of SORNA and from the Government's arguments that it is not directed at "carrying into Execution" any of the federal powers enumerated in the Constitution, Art. I, §8, cl. 18, but is instead aimed at protecting society from sex offenders and violent child predators. See 42 U. S. C. §16901 ("In order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against the victims listed below, Congress in this chapter establishes a comprehensive national system for the registration of those offenders"); Tr. of Oral Arg. 3 ("Convicted sex offenders pose a serious threat to public safety. When those convictions are entered under Federal law, Congress has the authority to impose both a criminal and a civil sanction for that conduct in order to protect the public"); Brief for United States 3 (same).

Protecting society from sex offenders and violent child predators is an important and laudable endeavor. See *Kennedy* v. *Louisiana*, 554 U. S. 407, 467 (2008) (ALITO, J., dissenting) (explaining that, for most Americans, sexual abuse of children is the "epitome of moral depravity"). But "the Constitution does not vest in Congress the authority to protect society from every bad act that might befall it." *Comstock*, 560 U. S., at 165 (THOMAS, J., dissenting). The power to protect society from sex offenders is part of the general police power that the Framers reserved to the States or the people. See Amdt. 10; *Morrison*, *supra*, at 617 ("[W]e can think of no better example of the police power, which the [Framers] denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"); *Lopez*, *supra*, at 561, n. 3. ("'[T]he 'States possess primary authority for defining and enforcing the criminal law'" (quoting *Brecht*

v. *Abrahamson*, 507 U. S. 619, 635 (1993))).[2]

_____

[2] All 50 States have used their general police powers to enact sex offender registration laws. See, *e.g.,* Ala. Code §§13A–11–200 to 13A–11–202, 13A–11–1181 (2006); Alaska Stat. §§11.56.840, 12.63.010 to 12.63.100, 18.66.087, 28.05.048, 33.30.035 (2006); Ariz. Rev. Stat. Ann. §§13–3821 to 13–3825 (2001 and Supp. 2007); Ark. Code Ann. §§12–12–901 to 12–12–909 (2003 and Supp. 2007); Cal. Penal Code Ann. §§290 to 290.4 (2008); Colo. Rev. Stat. Ann. §§16–22–103 to 16–22–104, 18–3–412.5 (2007); Conn. Gen. Stat. §§54–251 to 54–254 (2008 Supp.); Del. Code Ann., Tit. 11, §4120 (2007); Fla. Stat. Ann. §§775.13, 775.21 (2007); Ga. Code Ann. §42–1–12 (Supp. 2007); Haw. Rev. Stat. §§846E–1, 846E–2 (2006 Cum. Supp.); Idaho Code §§18–8304 to 18–8311 (Supp. 2008); Ill. Comp. Stat., ch. 730, §§150/1 to 150/10, 152/101 to 152/121 (West 2006); Ind. Code §§11–8–8–1 to 11–8–8–7 (Supp. 2007); Iowa Code §§692A.1 to 692A.16 (2003 and Supp. 2008); Kan. Stat. Ann. §§22–4901 to 22–4910 (1995); Ky. Rev. Stat. Ann. §§17.500 to 17.540 (Lexis 2003 and Supp. 2007); La. Rev. Stat. Ann. §§15:540 to 15:549 (2005 and Supp. 2008); Me. Rev. Stat. Ann., Tit. 34–A, §§11201 to 11204, 11221 to 11228 (2007 Supp. Pamphlet); Md. Crim. Proc. Code Ann. §§11–701 to 11–721 (Lexis 2001 and Supp. 2007); Mass. Gen. Laws, ch. 6, §§178D to 178T (West 2006 and Supp. 2008); Mich. Comp. Laws §§28.721 to 28.731 (West 2004 and Supp. 2008); Minn. Stat. Ann. §243.166 (West 2003 and Supp. 2008); Miss. Code Ann. §§45–33–21 to 45–33–59 (West 1999 and Supp. 2007); Mo. Rev. Stat. §§589.400 to 589.425 (2003 and Supp. 2008), §211.45 (2004); Mont. Code Ann. §§46–23–501 to 46–23–507 (2007); Neb. Rev. Stat. §§29–4001 to 29–4013 (2003 and Supp. 2007); Nev. Rev. Stat. §§179B.010 to 179B.250 (2007); N. H. Rev. Stat. Ann. §§651–B:1 to 651–B:7 (West 2007 and Supp. 2007); N. J. Stat. Ann. §§2C:7–1 to 2C:7–20 (West 2005 and Supp. 2008); N. M. Stat. Ann. §§29–11A–1 to 29–11A–8 (2004 and Supp. 2008); N. Y. Correc. Law Ann., Art. 6–C, §§168 to 168–V (West 2003 and Supp. 2008); N. C. Gen. Stat. Ann. §§14–208.5 to 14–208.26 (Lexis 2007); N. D. Cent. Code Ann. §12.1–32–15 (Lexis 1997 and Supp. 2007); Ohio Rev. Code Ann. §§2950.01 to 2950.11 (West 2006 and Supp. 2008); Okla. Stat., Tit. 57, §§581 to 585 (West 2001), Tit. 57, §§591 to 594 (West 2007 Supp.); Ore. Rev. Stat. §§181.585 to 181.606, 181.826 (2007); 42 Pa. Cons. Stat. §§9791 to 9799.9 (2006); R. I. Gen. Laws §§11–37.1–1 to 11–37.1–12 (2002 and Supp. 2007); S. C. Code Ann. §§23–3–430 to 23–3–490 (2007 and Supp. 2007); S. D. Codified Laws §§22–24B–1 to 22–24B–15 (2006 and Supp. 2008); Tenn. Code Ann. §§40–39–201 to 40–39–212 (2006 and Supp. 2007); Tex. Crim. Proc. Code Ann., Arts. 62.001 to 62.002, 62.051 to 62.059 (Vernon 2006 and

The Government has failed to identify any enumerated power that §2250(a)(2)(A) "carr[ies] into Execution" in this case. Accordingly, I would hold that §2250(a)(2)(A) and the registration requirements that it enforces are unconstitutional as applied to Kebodeaux.

### III

In concluding otherwise, the Court entirely skips *McCulloch*'s first step—determining whether the end served by SORNA is "within the scope of the [C]onstitution." 4 Wheat., at 421. The Court appears to believe that Congress' power "to 'make Rules for the . . . Regulation of the land and naval Forces'" justifies imposing SORNA's registration requirements on Kebodeaux. *Ante,* at 6. But not one line of the opinion explains how SORNA is directed at regulating the armed forces. Instead, the Court explains how SORNA and the Wetterling Act serve various ends that are *not* enumerated in the Constitution. Cf. *ante,* at 12 (explaining that SORNA was designed to "keep track of more offenders" and "encourage States . . . to adopt its uniform standards"); *ante,* at 8 (explaining that the Wetterling Act was designed to "protect the public from . . . federal sex offenders and alleviate public safety concerns"). The Court's failure to link SORNA to any enumerated power results in analysis that is untethered from the Constitution and disregards the admonition that "[t]he powers of the legislature are defined, and limited." *Marbury*, 1 Cranch, at 176.

---

Supp. 2008); Utah Code Ann. §77–27–21.5 (2003 and 2008 Supp.); Vt. Stat. Ann., Tit. 13, §§5401 to 5414 (1998 and Supp. 2007); Va. Code Ann. §§9.1–900 to 9.1–921 (2006 and Supp. 2007); Wash. Rev. Code Ann. §§4.24.550, 9A.44.130, 9A.44.140, 10.01.200, 70.48.470, 72.09.830 (2006); W. Va. Code Ann. §§15–12–1 to 15–12–10 (Lexis 2004 and Supp. 2007); Wis. Stat. §§301.45 to 301.48 (2005 and Supp. 2007); Wyo. Stat. Ann. §§7–19–301 to 7–19–307 (2005).

### A

The Court's analysis is flawed at every step. It begins by explaining that "at the time of his offense Kebodeaux was subject to the federal Wetterling Act, an Act that imposed upon him registration requirements very similar to those that SORNA later mandated."[3] *Ante,* at 4. But that is beside the point. Kebodeaux was convicted of violating SORNA's registration requirements, not the Wetterling Act's, and so the relevant question is what enumerated power *SORNA* "carr[ies] into Execution." "The Necessary and Proper Clause does not provide Congress with authority to enact any law simply because it furthers *other laws* Congress has enacted in the exercise of its incidental authority; the Clause plainly requires a showing that every federal statute 'carr[ies] into Execution' one or more of the Federal Government's *enumerated* powers." *Comstock*, 560 U. S., at 168 (THOMAS, J., dissenting).

Nevertheless, apparently in an effort to bootstrap the Wetterling Act, the Court proceeds to determine whether the Wetterling Act (not SORNA) falls within Congress'

---

[3] THE CHIEF JUSTICE wrongly asserts that the differences between the Wetterling Act and SORNA are "insignificant." *Ante,* at 2 (opinion concurring in judgment). SORNA increases the federal penalty for failing to register from a misdemeanor punishable by no more than one year to a felony punishable by up to 10 years for a first offense. Compare 18 U. S. C. §2250(a) with 42 U. S. C. §14072(i) (2000 ed.). It is simply incorrect to minimize that change by saying that Kebodeaux received only a day more than he could have received for failing to register under the Wetterling Act. *Ante,* at 2 (ROBERTS, C. J., concurring in judgment). The "legally prescribed range *is* the penalty affixed to the crime," *Alleyne* v. *United States*, *ante,* at 11, and SORNA increased that range significantly. SORNA also requires that a sex offender who moves update his registration within three days of moving, instead of seven. Compare 42 U. S. C. §16913(c) with App. to Pet. for Cert. 167a–168a. Thus, a person can be convicted under SORNA for conduct that would have complied with the Wetterling Act.

power under the Necessary and Proper Clause. The Court first notes that the Clause "'leave[s] to Congress a large discretion as to the means that may be employed in executing a given power,'" *ante,* at 7 (quoting *Lottery Case,* 188 U. S. 321, 355 (1903))—a fact that is entirely irrelevant under *McCulloch*'s first step of determining whether the *end* is itself legitimate. The Court then observes that the Necessary and Proper Clause

> "authorizes Congress, in the implementation of other explicit powers, to create federal crimes, to confine offenders to prison, to hire guards and other prison personnel, to provide prisoners with medical care and educational training, to ensure the safety of those who may come into contact with prisoners, to ensure the public's safety through systems of parole and supervised release, and, where a federal prisoner's mental condition so requires, to confine that prisoner civilly after the expiration of his or her term of imprisonment." *Ante,* at 7.

From these powers, the Court reasons that the Wetterling Act is valid because "Congress could reasonably conclude that registration requirements applied to federal sex offenders after their release can help protect the public from those federal sex offenders and alleviate public safety concerns." *Ante,* at 8. As I explained in *Comstock,* however, this mode of analysis confuses the inquiry. 560 U. S. at 168–169 (THOMAS, J., dissenting). "Federal laws that criminalize conduct . . . , establish prisons for those who engage in that conduct, and set rules for the care and treatment of prisoners awaiting trial or serving a criminal sentence" are only valid if they "'Execut[e]'" an enumerated power. *Id.,* at 169. Here, for example, Congress has authority to enact Article 120(b) of the UCMJ, to enforce that provision against military personnel who violate it, and to confine them in a military prison while they are

awaiting trial and serving a sentence.  All of those actions "carr[y] into Execution" Congress' power to promote order and discipline within the military by regulating the conduct of military personnel.  Art. I, §8, cl. 14.

But the enumerated power that justified Kebodeaux's conviction does not justify requiring him to register as a sex offender now that he is a civilian.  If Kebodeaux were required to register as part of his criminal sentence, then registration would help execute the power that justifies his conviction.  The court-martial here, however, did not impose registration requirements at Kebodeaux's sentencing.  See *ante,* at 8 (acknowledging that registration is a "civil requirement" and was "not a specific condition of Kebodeaux's release").  Enacted long after Kebodeaux had completed his sentence, SORNA cannot be justified as a punishment for the offense Kebodeaux committed while in the military because retroactively increasing his punishment would violate the *Ex Post Facto* Clause.  See *Peugh* v. *United States*, 569 U. S. ___, ___ (2013) (slip op., at 8) (explaining that laws that "'inflic[t] a greater punishment . . . than the law annexed to the crime . . . when committed'" violate the *Ex Post Facto* Clause) (quoting *Calder* v. *Bull*, 3 Dall. 386, 390 (1798)); *Peugh, supra,* at ___ (THOMAS, J., dissenting) (slip op., at 11) (explaining that "laws retroactively increasing the punishment were . . . understood to be *ex post facto* at the time of the founding").  As the Court below correctly recognized, "because SORNA's registration requirements are civil and were enacted after Kebodeaux committed his crime, the [G]overnment cannot justify their constitutionality on the ground that they merely punish Kebodeaux for the crime he committed while in the military."  687 F. 3d, at 239. The only justification for SORNA that the Government has advanced is protection of the public, but that justification has nothing to do with Congress' power to regulate

the armed forces.[4]

Finally, the Court asserts that the Wetterling Act is reasonable because it "took state interests into account by, for the most part, requiring released federal offenders to register in accordance with state law," and its requirements are "reasonably narrow and precise." *Ante,* at 10. But the degree to which the Wetterling Act or SORNA accommodates State interests and intrudes on the lives of individuals subject to registration is irrelevant because the Supremacy Clause makes federal law supreme. See Art. VI, cl. 2. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Gregory* v. *Ashcroft*, 501 U. S. 452,

———————

[4] THE CHIEF JUSTICE contends that Congress has authority to impose registration as a consequence of Kebodeaux's conviction because "[a] servicemember will be less likely to violate a relevant military regulation if he knows that, having done so, he will be required to register as a sex offender years into the future." *Ante,* at 2. But SORNA could not possibly have deterred Kebodeaux from violating any military regulation because it was enacted *after* he left the military.

JUSTICE ALITO contends that, by trying members of the military in a military court, Congress exacerbated "the possibility that a convicted sex offender may escape [the state] registration [system]," and that SORNA is necessary and proper to correct this problem. *Ante,* at 3 (opinion concurring in judgment). But JUSTICE ALITO has not identified any enumerated power that gives Congress authority to address this supposed problem, and there is no evidence that such a problem exists. Indeed, Texas has indicated that SORNA *undermines* its registration system, rather than making it more effective. See Letter from Jeffrey S. Boyd, General Counsel and Acting Chief of Staff, Texas Office of the Governor, to Linda Baldwin, Director, SMART Office 1 (Aug. 17, 2011) ("Although we in Texas certainly appreciate and agree with the stated goals of SORNA, the adoption of this 'one-size-fits-all' federal legislation in Texas would in fact undermine the accomplishment of those objectives in Texas, just as it would in most other states"), online at http://www.ncleg.net/documentsites/committees/JLOCJPS/October% 2013,%202011%20Meeting/RD_SORNA_General_Information_2011-10- 13.pdf (as visited June 21, 2013, and available in Clerk of Court's case file).

460 (1991). The fact that the Wetterling Act and SORNA may be "narrow" and "[take] state interests into account," *ante,* at 10, is "not a matter of constitutional necessity, but an act of legislative grace." *Comstock*, 560 U. S., at 178 (THOMAS, J., dissenting). These factors have no place in deciding whether a law "Execut[es]" an enumerated power.

B

The Court not only ignores the limitations on Congress' power set forth in the Constitution, but it also ignores the limits that it marked just three years ago in *Comstock*. In that case, this Court held that Congress has power under the Necessary and Proper Clause to enact 18 U. S. C. §4248, which authorizes the Federal Government to civilly commit "sexually dangerous persons" beyond the date it lawfully could hold them on a charge or conviction for a federal crime. *Comstock*, 560 U. S., at 142. The Court rebuffed the assertion that it was conferring a general police power on Congress by asserting that §4248 was "limited to individuals already 'in the custody of the' Federal Government." *Id.,* at 148. The Solicitor General even conceded at oral argument that "the Federal Government would not have . . . the power to commit a person who . . . has been released from prison and whose period of supervised release is also completed" because "at that point the State police power over a person has been fully reestablished." Tr. of Oral Arg. in *United States* v. *Comstock* O. T. 2009, No. 08–1224, p. 9. The Court and the Government today abandon even that meager restriction, which itself lies far beyond the constitutional limits. Kebodeaux was no longer in federal custody when Congress enacted SORNA, yet the Court disregards the fact that, even under *Comstock*, release from prison and supervised release terminates any hold the Federal Government might otherwise have and "fully reestablishe[d]" the State's police power over that individual.

\*    \*    \*

The Framers believed that the division of powers between the Federal Government and the States would protect individual liberty. See *New York* v. *United States*, 505 U. S. 144, 181 (1992) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power'" (quoting *Coleman* v. *Thompson*, 501 U. S. 722, 759 (1991) (Blackmun, J., dissenting)). The decision today upsets that careful balance. I respectfully dissent.